## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRUIT

| | | |
|---|---|---|
| **DONNA ROBERTS,** | ) | **Case No. 23-3789** |
| | ) | |
| **Petitioner-Appellant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TERI BALDAUF, Warden,** | ) | **DEATH PENALTY CASE** |
| | ) | |
| **Respondent-Appellee.** | ) | |

---

## PETITIONER-APPELLANT DONNA ROBERTS' APPLICATION FOR AN EXPANDED CERTIFICATE OF APPEALABILITY

---

Pursuant to Federal Rule of Appellate Procedure 22(b) and Sixth Circuit Rule 22(a), Petitioner-Appellant Donna Roberts respectfully requests an expanded Certificate of Appealability ("COA") on her Second, Third, Fourth, Fifth, and Seventh Claims for Relief. These claims have merit and, at a minimum, are adequate to deserve encouragement to proceed further. The reasons in support of this request are more fully set forth in the attached Memorandum of Law.

Respectfully submitted,

STEPHEN C. NEWMAN (0051928)
FEDERAL PUBLIC DEFENDER

*/s/ Calland M. Ferraro*
Calland M. Ferraro (0093439)
Assistant Federal Public Defender

*/s/ Jillian S. Davis*
Jillian S. Davis (0067272)
Research and Writing Attorney
Office of the Federal Public Defender,
Northern District of Ohio, Capital Habeas Unit
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856 (o); (216) 522-1951 (f)
Calland_Ferraro@fd.org
Jillian_Davis@fd.org

*Counsel for Donna Roberts*

## Certificate of Compliance

I hereby certify that the above Application for an Expanded Certificate of Appealability complies with the typeface and type-style requirements and with the type-volume limitations because it contains 70 words. *See* Fed. R. App. P. 22; 6th Cir. R. 22; *see also* Fed. R. App. P. 27(d)(2) (to the extent applicable).

## Certificate of Service

I hereby certify that on February 21, 2024, a copy of the above Application for an Expanded Certificate of Appealability was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully Submitted,

*s/Calland M. Ferraro*
Calland M. Ferraro

*Counsel for Donna Roberts*

# MEMORANDUM OF LAW

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...............................................................................i

INTRODUCTION .......................................................................................1

BACKGROUND .........................................................................................3

    I.    Guilt phase of trial .........................................................................3

    II.    Penalty phase of trial .....................................................................6

    III.    First direct appeal and first resentencing .....................................8

    IV.    Second direct appeal and second resentencing ...........................11

    V.    Post-conviction proceedings .......................................................12

    VI.    Federal habeas proceedings.........................................................16

ARGUMENT .............................................................................................17

    I.    This Court should grant a COA on Ms. Roberts' claims for ineffective assistance of counsel (Second, Third, and Fourth Claims for Relief).................................................................................18

        A.    Counsel performed deficiently during the guilt phase of trial, causing prejudice to Ms. Roberts (Fourth Claim for Relief)....................................................................................20

            1.    Counsel failed to develop a coherent defense strategy, culminating in their refusal to give opening and closing argument ...................................... 20

            2.    Counsel's failure to give opening and closing argument prejudiced Ms. Roberts...................................24

            3.    The district court's assessment of this claim is wrong and, at the very least, debatable ......................................28

                a.    Declining lawyer argument cannot be viewed as a tactical decision given the facts of this case ...................................................................29

       b.   Nothing in the record suggests Ms. Roberts waived opening and closing argument during the guilt phase........................................................31

       c.   The state court did not adjudicate the prejudice prong, which should be reviewed *de novo* ...........36

   B.   Counsel's deficient performance during the penalty phase of trial prejudiced Ms. Roberts (Second and Third Claims for Relief)................................................................. 37

       1.   Counsel failed to adequately investigate the mitigation evidence and advise Ms. Roberts about the penalty phase ....................................................37

       2.   Counsel's failures during the penalty phase prejudiced Ms. Roberts....................................45

       3.   The district court's assessment of this claim is wrong and, at the very least, debatable ......................................51

II.   This Court should grant a COA on Ms. Roberts' claim regarding her incompetency at resentencing (Seventh Claim for Relief) ...........57

   A.   The trial court deprived Ms. Roberts of a reasonable opportunity to demonstrate incompetence at resenting, thereby violating Ms. Roberts' due-process rights ..................57

   B.   The district court's assessment of this claim is wrong and, at a minimum, debatable ...........................................62

III.   This Court should grant a COA on Ms. Roberts' claim regarding pretrial publicity (Fifth Claim for Relief) ..........................................65

   A.   The pretrial publicity in Ms. Roberts case was presumptively prejudicial..........................................66

   B.   The district court's assessment of this claim is wrong and, at a minimum, debatable ........................................73

CONCLUSION ...................................................................................76

CERTIFICATE OF SERVICE ...............................................................77

## INTRODUCTION

Deeply embedded in our criminal-justice system is the idea that "the possession of the fullest information possible concerning the defendant's life and characteristics" is "essential" to the selection of an appropriate sentence. *Pepper v. United States*, 562 U.S. 476, 488 (2011). And in the capital context, "individualized consideration" is more than just important—it is a "constitutional requirement," given that "the imposition of death by public authority is so profoundly different from all other penalties." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

Donna Roberts never received this individualized consideration. Neither the judge nor the jury had evidence vital to their decision to impose a death sentence. Ms. Roberts was sexually abused at a young age and witnessed her father physically and emotionally abuse her mother. Still, she was able to grow into an independent woman who did great acts of charity and supported her family members in times of need. She did this despite a long and documented history of mental illness. Before she was convicted, several car accidents left her with cognitive deficiencies. She had been diagnosed with bipolar disorder and depression and received social security income as a result of these illnesses. The year before the crime, she had attempted suicide and was committed to a psychiatric hospital. And after she was arrested, her mental-health struggles continued in prison, manifesting in hallucinations and delusional thinking.

1

Yet her sentencers had none of this evidence. Because of her mental illnesses, she directed her trial counsel to waive all mitigating evidence except for her own unsworn statement. Without conducting a constitutionally adequate mitigation investigation, and without fully advising their client regarding the penalty phase, Ms. Roberts' counsel openly conceded her competency to make such a decision. Then, in her unsworn statement, Ms. Roberts demanded that the jury give her the death penalty. They obliged and the trial court ultimately sentenced her to death.

Because the trial court had the prosecution draft the sentencing opinion, the Ohio Supreme Court vacated the death sentence and remanded for resentencing. At that point, and with new counsel, Ms. Roberts sought to present full mitigating evidence. The trial court barred her from doing so.

Ms. Roberts' sentencers therefore lacked the evidence that—as a constitutional matter—was necessary for them to sentence her to death. This evidence is compelling and would have likely convinced at least one juror to recommend a life sentence, particularly given that Ms. Roberts was not charged as the principal offender in the crime.

Given all this, Ms. Roberts sought habeas relief in federal court. The district court denied relief but granted a certificate of appealability ("COA") on her claim regarding the trial court's refusal to hear mitigating evidence at resentencing. Ms. Roberts now asks this Court to expand the COA to include her claims relating to

2

ineffective assistance of counsel during both the guilt and penalty phases of trial, her incompetence at resentencing, and juror prejudice caused by pretrial publicity. These claims have merit. At the very least, they are debatable and adequate to deserve encouragement to proceed further, which is all that is required for a COA. Accordingly, this Court should grant an expanded COA on Ms. Roberts' Second, Third, Fourth, Fifth, and Seventh Claims for Relief.

## BACKGROUND

### I.    Guilt phase of trial

In December 2001, the State of Ohio charged Ms. Roberts with aggravated murder for allegedly conspiring with Nathaniel Jackson, at the time a prison inmate with whom she was having an intimate relationship, to kill Ms. Roberts' ex-husband/roommate Robert Fingerhut. The State presented the following evidence during the guilt-phase of the trial.

In the early hours of December 12, 2001, a notably shaken Ms. Roberts called 911. Trial Tr., R. 11-3, PageID # 5454, 5456–63. Police arrived to find Ms. Roberts visibly distraught outside her home. *Id.* at PageID # 5429. They discovered Mr. Fingerhut laying in the entrance to the home from the garage with multiple gunshot wounds. *Id.* at PageID # 5430. They also noticed that Mr. Fingerhut's car was not in the garage, and they later recovered the vehicle not far from the residence where Mr. Jackson was staying. *Id.* at PageID # 5908, 5931.

Police testified that, while they were investigating the scene, Ms. Roberts exhibited "emotional highs and lows." *Id.* at PageID # 5435. Some officers testified that they thought she was fake crying, *id.*, while others stated it appeared that she had actually been crying. *Id.* at PageID # 6138, 6249. (An acquaintance also testified that Ms. Roberts was later acting "odd" at Mr. Fingerhut's funeral, though the witness did not elaborate. *Id.* at PageID # 5492.).

The same day, police discovered letters between Mr. Jackson and Ms. Roberts in her bedroom and in the trunk of her car. *Id.* at PageID # 6163–65, 6175. Ms. Roberts had made no effort to hide those letters before calling the police to her home. *Id.* at PageID # 6273–76. The letters were suggestive of a plan for Mr. Jackson to kill Mr. Fingerhut once Mr. Jackson was released from prison. *See* Letters, R. 12-17 through R. 12-23. When asked about the letters, Ms. Roberts said they constituted mere prison talk and that she was just telling Mr. Jackson what he wanted to hear. Trial Tr., R. 11-3, PageID # 6202. Police thereafter called the Lorain Correctional Institution, where Mr. Jackson had been incarcerated, to obtain copies of phone calls between Ms. Roberts and Mr. Jackson. *Id.* at PageID # 5420. In those calls, Mr. Jackson again suggested such a plan. Call Tr., R. 12-24, PageID # 12466–630.

An employee at the Days Inn in Boardman, Ohio also testified at trial that he had rented a room to Ms. Roberts on December 11, 2001, the day before the 911 call. Trial Tr., R. 11-3, PageID # 5651–62. Blood stains were found in the hotel

room that matched Mr. Jackson's DNA.  *Id.* at PageID # 5663–69, 6047–49.  An insurance agent also testified that Mr. Fingerhut had two life insurance policies designating Ms. Roberts as the beneficiary.  *Id.* at PageID # 5540–63.

At trial, the State never contended that Ms. Roberts was in the home at the time of the murder.  Rather, it introduced testimony that, during the relevant time, she was seen driving very slowly near a Giant Eagle.  Trial Tr., R. 11-3, PageID # 6402, 5464–75.

Ms. Roberts was ultimately arrested on December 20, 2001, and she afterwards helped police obtain Mr. Jackson's location, from which he was arrested.  *Id.* at PageID # 6314–15.

In response to the State's case, defense counsel presented no witnesses on behalf of Ms. Roberts.  Nor did defense counsel present an opening statement or a closing argument, even though the State provided both.  Trial Tr., R. 11-3, PageID # 5334, 5364–65, 6396, 6425–26.  The jury ultimately convicted Ms. Roberts on all counts, including complicity in aggravated murder.  *Id.* at PageID # 6489–95.

Notably, during the guilt-phase of trial, Ms. Roberts' competency became an issue.  In the middle of the trial, defense counsel raised with the judge that Ms. Roberts' psychiatrist had "upped her medication" and that this "change in medication ha[d] impacted her ability to follow the[] proceedings and reasonably assist [counsel] in the[] proceedings."  *Id.* at PageID # 5976–77.  Rather than insist

5

on competency proceedings, defense counsel simply contacted Ms. Roberts' doctor and insisted that her medication be changed back to the original dosage. *Id.* at PageID # 5977–86. The next day, counsel told the court that although Ms. Roberts was not "as alert as she normally is," they felt she was "able to proceed." *Id.* at PageID # 5984–85. When the prosecution suggested that the court should "make inquiry of the Defendant to make sure that she's able to proceed today," defense counsel stated, "I'm not sure we'll permit that." *Id.* at PageID # 5986. The court then asked only a single question: "Donna, are you comfortable with proceeding today?" to which Ms. Roberts simply replied, "Yes." *Id.* That ended the inquiry.

## II.    Penalty phase of trial

Three days after the guilty verdict, Ms. Roberts informed the court that she desired to waive the presentation of all mitigating evidence other than her unsworn statement. *Id.* at PageID # 6501. In response, the trial court appointed Dr. Thomas Eberle to evaluate Ms. Roberts' competency to make that decision. Despite his failure to conduct any formal testing and only speaking with her for "a couple of hours th[at] morning," Dr. Eberle concluded that Ms. Roberts was competent. Trial Tr., R. 11-3, PageID # 6507–10. Defense counsel declined to question Dr. Eberle. *Id.* at PageID # 6510–11.

In fact, defense counsel openly conceded Ms. Roberts' competency to waive the presentation of independent mitigating evidence. *See id.* at PageID # 6503–06

("I'll state on the record that it is my personal and professional opinion that Donna's decision making process was rational and that she's competent to make the decision."). In doing so, counsel only vaguely described the little evidence that he had uncovered—and that he would have put on—for mitigation. *Id.* at PageID # 6503–04. He mentioned "hospital records" and "counseling records" without elaborating on what those records contained. *Id.* And he said he generally made "arrangements for basically family members to come and testify" while omitting that he had not actually spoken with those family members to obtain information. *Id.* Given defense counsel's concessions, the trial court ultimately determined that Ms. Robert was competent to waive the presentation of independent mitigating evidence. *Id.* at PageID # 6514.

Two days later, Ms. Roberts made her unsworn statement to the jury. *Id.* at PageID # 6532–79. In it, she mostly critiqued the guilt-phase evidence, the prosecutor, the police, and the media. *Id.* Though she told the jury she was not admitting guilt, she concluded by asking them to return a death verdict. *Id.* at PageID # 6574–76. The State then gave its closing argument, after which the defense waived any closing argument of its own. *Id.* at PageID # 6580–88. A mere five days after the jury returned the guilty verdict, the same jury recommended that Ms. Roberts be sentenced to death. *Id.* at PageID # 6608.

When it came time for the trial-court judge to read his sentencing decision in open court, defense counsel noticed something strange. The prosecutor seemed to already possess the sentencing decision and was following along with his own copy. *Id.* at PageID # 6644. Upon inquiry from the defense, the judge revealed that the prosecutor had, in fact, written the sentencing opinion and provided it to the judge, without informing defense counsel. *Id.* at PageID # 6645–51. Defense counsel, of course, objected. *Id.* at PageID # 6645. The trial court nonetheless proceeded with sentencing, accepted the jury's recommendation, and sentenced Ms. Roberts to death. *Id.* at PageID # 6658.

## III.   First direct appeal and first resentencing

On appeal, the Ohio Supreme Court affirmed Ms. Roberts' conviction but vacated the death sentence "because of the critical constitutional interests and notions of justice that are implicated by the prosecutor's participation in drafting the sentencing opinion." *State v. Roberts*, 850 N.E.2d 1168, 1172, 1188–90 (Ohio 2006). It remanded for new sentencing proceedings so that the trial court could "determine anew the appropriateness of the death penalty." *Id.* at 1190.

Before the same judge on remand, Ms. Roberts procured new counsel for resentencing. Resentencing counsel moved the trial court for release of records and for funds to obtain expert psychiatric assistance. *See* Defense Motions, R. 12-5, PageID # 8539–42, 8543–49, 8582–84, 8701–02. They also moved to present

mitigation evidence during the resentencing proceedings. *Id.* at PageID # 8558–63, 8587–8604. The trial court denied the motions, finding that the case had been remanded from the Ohio Supreme Court "with one narrow issue involved and that is for me to do another independent review of the mitigating aggravating factors and to type my findings to resubmit into this case. There is no instruction from the Supreme Court as to anything other than that that I read." Resentencing Tr., R. 11-4, PageID # 6669, 6702, 6706, 6731; *see also* Order, R. 12-5, PageID # 8585. Counsel then proffered the evidence they would have introduced had they been permitted to. Resentencing Tr., R. 11-4, PageID # 6702–04, 6727. [1]

The State, however, insisted that they had to determine whether Ms. Roberts was competent to be resentenced. *Id.* at PageID # 6672. The trial court therefore appointed Dr. Thomas Gazley to evaluate Ms. Roberts' competency. Dr. Gazley conducted an extremely limited examination—he interviewed Ms. Roberts for two and a half hours and reviewed only a portion of her mental-health records for about an hour. *Id.* at PageID # 6680–702. He ultimately concluded that Ms. Roberts was competent to be resentenced, and the trial court accepted that conclusion. *Id.* at PageID # 6704–05. The court denied the defense's request for an independent

---

[1] The court never considered the proffered evidence. *Id.* at PageID # 6731. It stated: "[h]ad the information that you have presented presently been presented at the other trial, I have no opinion on whether that would have made a difference or not." *Id.*

expert, so defense counsel presented no witnesses at the hearing. *Id.* at PageID # 6703.

Proceeding with resentencing, the trial court permitted Ms. Roberts to make a statement in allocution. This statement stood in stark contrast to the one the jury heard. *See* Resentencing Tr., R. 11-4, PageID # 6707–26. Ms. Roberts provided a vivid account of her upbringing and her life leading up to the crime. She disclosed that, as a young child, she was raped by an older cousin and repeatedly witnessed her father physically and emotionally abuse her mother. *Id.* at PageID # 6707–08. She recounted that she had been in three major car accidents, each involving head injuries. *Id.* at PageID # 6709–11. The final accident in 1999 impacted her cognitive abilities. *Id.* She thereafter attempted to commit suicide through $CO_2$ poisoning and, as a result, was hospitalized in a psychiatric ward. *Id.* at PageID # 6712–13. And she then received social security disability benefits due to her mental disabilities. *Id.* at PageID # 6714–15.

Ms. Roberts additionally detailed her acts of charity throughout her life, including assisting a persecuted Ethiopian Jew get safe passage to Israel and assisting in reconstructive surgery for disfigured Israeli soldiers. *Id.* at PageID # 6717–19. In closing, she explained that, in her letters with Mr. Jackson, she "never initiated any talk of hurting anyone." *Id.* at PageID # 6725. She stated that she

"never intended for anything like that to happen" and that she and Mr. Fingerhut "loved each other." *Id.* at PageID # 6726.

Despite responding, "I never thought for a moment that you are a bad person," the trial court again resentenced Ms. Roberts to death. *Id.*; *id.* at PageID # 6732.

## IV.    Second direct appeal and second resentencing

On Ms. Roberts' second direct appeal, the Ohio Supreme Court rejected her claim that the trial court's refusal to hear mitigating evidence at her resentencing violated *Lockett v. Ohio*, 438 U.S. 586 (1978) and its progeny. *State v. Roberts*, 998 N.E.2d 1100, 1105–09 (Ohio 2013). The state court also rejected Ms. Roberts' competency-to-be-resentenced claim. *Id.* at 1117–18. However, the state court again vacated Ms. Roberts' sentence because the trial court, in its sentencing opinion, had failed to consider Ms. Roberts' allocution. *Id.* at 1115.

On remand, the trial court again barred the presentation of any evidence in mitigation. Resentencing Tr., R. 11-4, PageID # 6765. And it "granted little to no weight to any of the mitigating factors outlined by Roberts in her allocution." *Id.* at PageID # 6792–93. The court noted that "[t]here is no evidence" to support Ms. Roberts' statements in her allocution, and it discounted the information in her allocution as mere claims or allegations. *Id.* at PageID # 6786, 6788–89. It therefore sentenced Ms. Roberts to death for the third time. *Id.* at PageID # 6794.

11

This time, the Ohio Supreme Court affirmed. *State v. Roberts*, 78 N.E.3d 851 (2017). Like the trial court, the Ohio Supreme Court noted the lack of corroborating evidence for her claims made in her allocution. *Id.* at 870 ("[H]er uncorroborated claims of an unhappy childhood are entitled to little weight, as is her claimed history of mental problems stemming from injuries resulting from traffic accidents."); *Id.* ("There is no other evidence of the statutory mitigating factors in this record.").

**V.    Post-conviction proceedings**

Ms. Roberts also petitioned the state court for post-conviction relief, presenting all the evidence that should have been presented during her initial mitigation hearing and resentencing proceedings. *See* Pet., R. 12-13, PageID # 10202–10398.[2]

That evidence strongly corroborated Ms. Roberts' allocution. It confirmed that Ms. Roberts suffered at least three car accidents throughout her life, with the final one in 1999 altering her behavior. Perry Aff., R. 12-13, PageID # 10256; Raymond Aff., R. 12-13, PageID # 10262–64; SSI Records, R. 12-13, PageID # 10374; St. Joseph records, R. 12-13, PageID # 10386–90. She completely isolated

---

[2] Presumably by mistake, the Warden omitted from the Return of Writ Appendix on the district-court docket many of the records, including prison records, that were submitted in state court. Ms. Roberts therefore intends to file with this Court a motion to expand the record on appeal in advance of appellate briefing.

herself from friends and family. *See* Perry Aff., R. 12-13, PageID # 10256; Raymond Aff., R. 12-13, PageID # 10264.

In 2000, the year before the crime, Ms. Roberts attempted suicide and was thereafter hospitalized in a psychiatric ward at St. Joseph's Hospital. Raymond Aff., R. 12-13, PageID # 10264; St. Joseph Records, R. 12-13, PageID # 10342–56. The discharge summary from St. Joseph's noted:

> The immediate reason for this hospitalization was because of severe anxiety, agitation, depression, auditory and visual hallucinations and suicidal ideations and intention by $CO_2$ poisoning. The patient stated that she has been getting quite tense, restless and depressed lately, having frequent mood swings, losing interest in doing things, having difficulties concentrating and started hearing voices talking to her.

St. Joseph Records, R. 12-13, PageID # 10342. Ms. Roberts was prescribed Remeron, Zyprexa, Vistaril, Premarin, Provera, Paxil, Depakote, and Risperdal. *Id.* The hospital's final diagnosis was "Bipolar disorder, circular type" and the "prognosis" was listed as "guarded." *Id.* at PageID # 10343.

Around this same time, Ms. Roberts applied for (and ultimately received) social security disability benefits based on her mental illnesses. Mr. Fingerhut even called the Social Security Administration to urge the agency to provide Ms. Roberts with those benefits. He informed the agency that, since the latest car accident, Ms. Roberts had become moody, irrational, emotionally unstable, and experienced memory problems and severe mood swings. SSI Records, R. 12-13, PageID # 10326–35. The psychologist who performed the SSI evaluation, Dr. Donald Degli,

13

found a full scale IQ of 65.  Degli Report, R. 12-13, PageID # 10381.  He also noted that her "[i]nterpersonal functioning was particularly impaired" and she had a "marginal capacity to interact competitively in a competitive workplace."  *Id.* at PageID # 10382.  Dr. Degli's report noted that Ms. Roberts, when asked if she was a happy person, responded "Well, I used to be. Now-- there is no reason to be happy. I am waiting to die now … any second. Don't you think so?"  *Id.* at PageID # 10381.

Post-conviction counsel also proffered an expert report from Dr. James R. Eisenberg, who stated that his review of Ms. Roberts' records "clearly indicates that Ms. Roberts suffers from Bipolar Type II Disorder."  Eisenberg Aff., R. 12-13, PageID # 10249–52.  He had been unable to conduct a full review of Ms. Roberts' condition, however, due to the denial of funds.  *Id.*

Post-conviction counsel additionally attached prison records revealing that her mental illnesses persisted after the crime.  *See* Exhibit List, R. 12-13, PageID # 10248.  The records consistently confirm her bipolar and depression diagnoses, hallucinations and delusional thinking, and her history of sexual abuse and witnessing family violence, likely resulting in post-traumatic stress disorder.  *See* Prison Records, R. 12-5, PageID # 8609–40; 8667–81; *see also* Records Summary,

R. 12-6, PageID # 8833–41; Records Summary, R. 12-5, PageID # 8593–8603; *see also* Petition, R. 10, PageID # 102.[3]

Counsel also submitted affidavits from Ms. Roberts' family members. *See* Perry Aff., R. 12-13, PageID # 10255–57; Raymond Aff., R. 12-13, PageID # 10259–67. Ms. Roberts' sister, Janice Perry, explained that their mother suffered severe depression, which was passed down to both Ms. Perry and Ms. Roberts. *See* Perry Aff., R. 12-13, PageID # 10255. Because of their mother's condition, Ms. Roberts essentially raised her little sister, and financially assisted her when she was older. *Id.* Ms. Perry also confirmed that their father was abusive to their mother, and at one point chased their mother with a gun. *Id.* Ms. Roberts' son, Michael Raymond, also described Ms. Roberts' life, her charity works, and their relationship, which was generally positive but grew more distant after her last car accident. Raymond Aff., R. 12-13, PageID # 10259–67. He also averred that Ms. Roberts had ordered several Chanukah gifts for Mr. Fingerhut only days prior to the crime, some of which arrived after Ms. Roberts was arrested. *Id.* at PageID # 10266. Both he and Ms. Perry confirmed that Ms. Roberts' trial counsel never reached out to obtain any of this information. Perry Aff., R. 12-13 PageID # 10257; Raymond Aff., R. 12-13, PageID # 10267.

---

[3] Again, these records will be the subject of the forthcoming motion to expand the record on appeal. *See supra* at 12 n.2.

Despite this evidence, the post-conviction court denied Ms. Roberts relief and the Ohio Supreme Court declined jurisdiction on December 29, 2020.  *State v. Roberts*, 159 N.E.2d 1158 (Table) (Ohio 2020).

## VI.   Federal habeas proceedings

Ms. Roberts then filed a habeas-corpus petition in the Northern District of Ohio.  *See* Petition, R. 10.  After briefing on the petition was complete, and before the court set any deadlines for evidentiary or record-related motions, Ms. Roberts moved the district court to stay the litigation pending the Sixth Circuit's decision in *Jackson v. Houk*, No. 21-3207 (6th Cir.).  Ms. Roberts explained that a different district court had granted habeas relief on a nearly identical *Lockett* claim in the case of her co-defendant, Mr. Jackson, and the issue was now before the circuit.  *See Jackson v. Houk*, No. 4:07-cv-00880, 2021 WL 698590 (N.D. Ohio Feb. 23, 2021).  The district court granted the stay.  Order, R. 31.

Then, a few months later—without lifting the stay or providing notice to Ms. Roberts—the district court dismissed her petition.  *See* Order, R. 31.  This was despite the fact *Jackson v. Houk* remained pending in the Sixth Circuit.  Because Ms. Roberts understood that the case was stayed, she had not filed any evidentiary-related motions.  *See* R. 32, PageID # 13190.  She therefore moved for reconsideration, which the district court denied.  *Id.*; *see also* Order, R. 35.  The district court reasoned that, even though it had not given her an opportunity to file

those motions, the motions would have proved futile. *Id.* at PageID # 13205. The court did, however, grant a certificate of appealability ("COA") on Ms. Roberts' First Claim for Relief, *i.e.*, the *Lockett* claim. Order, R. 31, PageID # 13185. It denied a COA on the remaining claims. *Id.*

Ms. Roberts then filed a timely notice of appeal with this Court and now moves for an expanded COA as to her Second, Third, Fourth, Fifth, and Seventh Claims for Relief.

## ARGUMENT

To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that this "threshold question" is not demanding. *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). "The COA inquiry . . . is not coextensive with a merits analysis. At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). In other words, Ms. Roberts "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

17

Accordingly, Ms. Roberts need not demonstrate that she will win her appeal. "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 338. Also, in death penalty cases, "any doubt about whether a COA should issue" should be "resolve[d] in the petitioner's favor." *Skinner v. Quarterman,* 528 F.3d 336, 341 (5th Cir. 2008).

Here, the district court's assessment of Ms. Roberts' claims regarding ineffective assistance of counsel, incompetence, and pretrial publicity was wrong and, at a minimum, debatable. Accordingly, those claims are adequate to deserve encouragement to proceed further, particularly in this death penalty case. This Court should therefore grant a COA on those claims.

## I.  This Court should grant a COA on Ms. Roberts' claims for ineffective assistance of counsel (Second, Third, and Fourth Claims for Relief).

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel. *Roe v. Flores-Ortega*, 528 U.S. 470, 476 (2000). To prevail on an ineffective-assistance-of-counsel claim, Ms. Roberts must satisfy a two-prong test. First, she must show that counsel performed deficiently: that "counsel's ineffectiveness fell below an objective standard of reasonableness" measured by "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Second, she must show prejudice: "that there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 684. This is less than a preponderance standard. *See id.* at 693 (rejecting a "more likely than not" standard); *see also West v. Bell*, 550 F.3d 542, 552 (6th Cir. 2008) ("The correct burden of proof under *Strickland*, however, is 'reasonable probability,' not preponderance of the evidence."). Accordingly, "[e]ven if the odds that the defendant would have been acquitted had he received effective representation appear to be less than fifty percent, prejudice has been established so long as the chances of acquittal are better than negligible." *Harris v. Thompson*, 698 F.3d 609, 644 (7th Cir. 2012) (quoting *Canaan v. McBride*, 395 F.3d 376, 386 (7th Cir. 2005)).

Ms. Roberts' trial counsel performed deficiently during both the guilt and penalty phases of trial. Counsel failed to develop a coherent defense theory, as illustrated by their failure to give an opening statement and closing argument during the guilt phase. Throughout the course of the representation, counsel also failed to adequately advise Ms. Roberts regarding the penalty phase of trial and the purpose of presenting mitigating evidence. And they failed to conduct a constitutionally sufficient mitigation investigation of Ms. Roberts' background and documented mental-health issues. All these deficiencies prejudiced Ms. Roberts both with respect to the guilty verdict and her ultimate death sentence.

### A.    Counsel performed deficiently during the guilt phase of trial, causing prejudice to Ms. Roberts (Fourth Claim for Relief).

Trial counsel's performance during the guilt phase fell far below prevailing professional norms.  Most strikingly, counsel declined to give both an opening and closing argument, so the jury never heard a coherent defense to the charges of aggravated murder.  This prejudiced Ms. Roberts in the jury's finding of guilt, as well as in the jury's weighing of aggravating circumstances and mitigating factors.  And all agree this claim was properly preserved for federal review.  *See* Order, R. 31, PageID # 13119, 13123.  This claim is therefore adequate to deserve encouragement to proceed further in this Court.

### 1.    Counsel failed to develop a coherent defense strategy, culminating in their refusal to give opening and closing argument.

The Supreme Court has long explained that "[t]he right to the effective assistance of counsel is [] the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing" through "*powerful statements* on both sides of the question."  *United States v. Cronic*, 466 U.S. 648, 656 (1984) (emphasis added).  This is particularly true in death-penalty cases: "Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the [jury's] decision in capital cases."  *Gardner v. Fla.*, 430 U.S. 349, 360 (1977).

These principles reveal why the Supreme Court long ago recognized the vital importance of lawyer argument during trial. Specifically, in *Herring v. New York*, the Court held that defendants have a constitutional right "to have his counsel make a proper argument on the evidence and the applicable law in his favor." 422 U.S. 853, 860 (1975). The Court reasoned that "closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial" because "no aspect of [lawyer] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Id.* at 858, 862. The Court elaborated:

> It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.

*Id.* at 862.

Given this precedent, federal courts have held that counsel performed deficiently—and have granted habeas relief—where counsel failed to give opening and closing arguments. *See, e.g.*, *Groseclose v. Bell*, 130 F.3d 1161, 1169 (6th Cir. 1997) (granting habeas relief on ineffective-assistance claim and noting that one aspect of the representation that the court found "especially appalling" was the failure "to make a closing argument"); *see also Carson v. United States*, Nos. 22-

21

3386/3419, 2023 U.S. App. LEXIS 1239, at *28 (6th Cir. Jan. 18, 2023) (granting a COA on ineffective-assistance claim based on counsel "inadequately presenting opening and closing arguments"). In *Lawhorn v. Allen*, for example, the Eleventh Circuit granted habeas relief on an ineffective-assistance-of-counsel claim because counsel performed deficiently by declining closing argument. 519 F.3d 1272, 1295 (11th Cir. 2008). The court explained that "[t]hrough closing argument, counsel has one 'last clear chance' or final opportunity to marshal all of the mitigating evidence before the jury and explain or minimize the prosecution's evidence." *Id.* (quoting *Herring*, 422 U.S. at 862). And "[e]ven in cases where the factual background is easily understood, closing argument by the defense can remind the factfinder of favorable facts that it may have forgotten or mistakenly downplayed or prematurely misjudged, and help prevent an erroneous verdict." *Id.* Accordingly, counsel performed deficiently by foregoing the opportunity for closing argument, and the state court's decision denying relief was "contrary to" clearly established federal law. *Id.* at 1297.

The same principles apply to opening statements. The standards set forth by the American Bar Association ("ABA")—which the Court has long referred to as "guides to determining what it reasonable"—make this clear. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). They provide that defense counsel "should be aware of the importance of an opening statement and, except in unusual cases, give an opening

statement immediately after the prosecution's, before the presentation of evidence begins."  ABA Standards for Criminal Justice 4-7.5(a); *see also Strickland*, 466 U.S. at 688 (citing ABA Standards for Criminal Justice).  These standards recognize what "social science research" also shows—"only a bad lawyer would have a general policy of waiving opening statements."  *Garcia v. Burton*, 536 F. Supp. 3d 560, 598 (N.D. Cal. 2021).

In Ms. Roberts' case, defense counsel failed to develop a coherent defense during the guilt phase of trial, as illustrated by counsel's refusal to provide lawyer argument in opening and closing.  At the beginning of trial, counsel declined to give an opening statement, instead insisting that Ms. Roberts read her own short statement to the jury.  This statement—occupying a mere half page of transcript—did not preview, with any specificity, the evidence the jury would hear.  Trial Tr., R. 11-3, PageID # 5364–65.  Nor did it lay out any type of case theory.  Rather, it boiled down to: "I am not guilty. And you'll know that when this case is over."  *Id.*  Ms. Roberts did not know that her attorneys would not also be making an opening statement on her behalf.  *See* Roberts Aff., R. 12-13, PageID # 10253.  Then, after conducting a limited cross-examination of the State's witnesses and putting on no witnesses of their own, defense counsel ultimately waived closing argument.  *See* Trial Tr., R. 11-3, PageID # 6425–26.  Ms. Roberts (yet again) was not consulted regarding this decision.  Roberts Aff., R. 12-13, PageID # 10254.

23

Accordingly, counsel relinquished their only opportunity to "argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions," as well as "the last clear chance to persuade the trier of fact that there may be reasonable doubt of [Ms. Roberts'] guilt." *Herring*, 422 U.S. at 862. There is no strategic reason to forego these important opportunities.

### 2. Counsel's failure to give opening and closing argument prejudiced Ms. Roberts.

Ms. Roberts was prejudiced by these deficiencies. The jury never heard the defense's "respective version[] of the case as a whole." *Id.* As explained in *Herring*, "the difference in any case between total denial of final argument and a concise but persuasive summation could spell the difference, for the defendant, between liberty and unjust imprisonment." *Id.* at 863.

And the circumstances surrounding Ms. Roberts' trial made opening and closing argument even more vital than the average case. During preliminary instructions, the judge told the jurors that "[t]he opening statements are very important" because they "give[] you landmarks, so to speak, to try to find as the evidence that's produced" and are "one of the few times that counsel, during the course of the trial, have an opportunity to speak directly to the jury." Trial Tr., R. 11-3, PageID # 5304–05. Yet, after the State gave a lengthy opening statement, defense counsel declined to give one. Moreover, the State gave a lengthy closing argument and ended by saying "now Defense counsel will have an opportunity to

24

address you." Trial Tr., R. 11-3, PageID # 6425.  Defense counsel then immediately waived closing argument.  *Id.*  Because the jury was essentially promised opening and closing lawyer arguments but never got them, the jury almost certainly drew a negative inference against the defense.  *See English v. Romanowski*, 602 F.3d 714, 729 (6th Cir. 2010) (explaining that an "unfulfilled promise" regarding what the jury would hear "created a negative inference against [the defendant] generally").

Moreover, the trial court forbade jurors from taking notes over the 15-day guilt phase of trial.  Trial Tr., R. 11-3, PageID # 4877–79.  That made lawyer arguments that much more important.  In *Herring*, the Supreme Court recognized the problem of fading memories—and the attendant importance of closing argument—in a case where the trial was much shorter and where the adjudicator actually *took* notes.  *See* 422 U.S. at 864 ("This three-day trial was interrupted by an interval of more than two days—a period during which the judge's memory may well have dimmed, however conscientious a note-taker he may have been.").

Had counsel presented lawyer argument, they could have argued that the State failed to meet its high burden to show that Ms. Roberts had the necessary mens rea for aggravated murder: "purposely" and "with prior calculation or design."  Ohio Rev. Code 2903.01(A), (B).[4]  "Purpose is the most culpable level in the standard

---

[4] Ms. Roberts was not the principal offender—she was instead charged with complicity to aggravated murder.  *See* Trial Tr., R. 11-3, PageID # 6435, 6448, 6454. But that does not change the State's burden, because a complicitor must "act[] with

mental-state hierarchy, and the hardest to prove." *Counterman v. Colorado*, 600

U.S. 66, 78–79 (2023).  The State must prove, beyond a reasonable doubt, that the

defendant had the "specific intention to cause" the victim's death.  Ohio Rev. Code

§ 2901.22(A); *see also Rosemond v. United States*, 572 U.S. 65, 76 (2014) ("To aid

and abet a crime, a defendant must not just in some sort associate himself with the

venture, but also participate in it as in something that he wishes to bring about and

seek by his action to make it succeed." (internal quotation marks omitted) (quoting

*Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)); *see also id.* ("[T]he intent

must go to the specific and entire crime charged.").

Due to the volume of the evidence at trial—including the calls and letters

between Ms. Roberts and Mr. Jackson—it was extremely important to highlight the

evidence that would have supported Ms. Roberts' statement (made to the police) that

her letters were just prison talk, that she was just telling Mr. Jackson what he wanted

to hear, and thus she did not ultimately intend for the murder to occur.  Trial Tr., R.

11-3, PageID # 6202.  For example, Ms. Roberts made zero effort to hide the letters

on the day of the murder, even though it was she who called the police to the scene.

*See, e.g.*, *id.* at PageID # 5457, 6164, 6175, 6273–76.  Moreover, police

acknowledged that, when they first arrived at the scene, Ms. Roberts' eyes were

---

the kind of culpability required for the commission of the offense."  Ohio Rev. Code
§ 2923.03(A).

puffy, and it was obvious that she had truly been crying. *Id.* at PageID # 6138, 6249. And counsel could have pointed out indications in the various letters and phone calls that Mr. Jackson clearly provided the impetus for the idea, and that Ms. Roberts had reservations. *See, e.g.*, *State v. Jackson*, 839 N.E.2d 362, 368–70 (Ohio 2006) (summarizing the letters and calls and concluding that "Roberts expressed misgivings about what Jackson was planning to do to Fingerhut."). An opening and closing summation of this defense would have been vital to placing the evidence into a coherent narrative and attacking the State's failure to meet its high burden of proving mens rea beyond a reasonable doubt.

Moreover, counsel's failures caused prejudice *in the penalty phase*. *See Harmon v. Sharp*, 936 F.3d 1044, 1082 (10th Cir. 2019) ("[G]uilt-phase error may also influence the jury's determination of sentence, resulting in penalty-phase error"). The lack of mens rea was relevant to the specifications that made Ms. Roberts eligible for the death penalty. Ohio Rev. Code § 2929.04(A)(7). This evidence also would have been highly influential in the jury's weighing of aggravating circumstances against mitigating factors. *See* Ohio Rev. Code § 2929.04(B) (directing that the sentencer "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense").

27

Counsel's refusal to give opening and closing argument, and their failure to consult with (or even notify) Ms. Roberts regarding this plan, likewise contributed to Ms. Roberts' actions with respect to mitigation. *See Cargle v. Mullin*, 317 F.3d 1196, 1208 (10th Cir. 2003) (noting, more generally, that "sentencing proceedings may be affected by errors in the preceding guilt phase"). Ms. Roberts was frustrated with what occurred at the guilt phase of trial, and that played into her decision to forego mitigation. *E.g.*, Roberts Aff., R. 12-13, PageID # 10253; *see also infra* at 42–45. Accordingly, Ms. Roberts has demonstrated a "reasonable probability" that, had counsel performed effectively, the outcome of her proceedings would have been different. *Strickland*, 466 U.S. at 694; *see supra* at 19. At a minimum, this claim is "adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 484.

### 3. The district court's assessment of this claim is wrong and, at the very least, debatable.

The district court incorrectly adjudicated this claim. It generically held that the decision to forego lawyer argument is "tactical"—without analyzing the fact-specific circumstances of the case. It also speculated that Ms. Roberts may have directed her counsel to forego lawyer argument during the guilt phase—speculation that is unsupported (and contradicted) by the record. And it disposed of the prejudice

prong in summary fashion.  Because the district court's assessment of the claim is at least debatable, a COA is warranted.

### a.  Declining lawyer argument cannot be viewed as a tactical decision given the facts of this case.

Both the state court and the district court denied Ms. Roberts' claim on the ground that "counsel's decision to waive opening or closing statements is generally viewed as a tactical one."  Order, R. 31, PageID # 13136–37.  But neither the district court nor the state court examined whether that decision was a tactical one *given the facts of this case*.  That contravenes *Strickland*, which dictates a "circumstance-specific reasonableness inquiry."  *Flores-Ortega*, 528 U.S. at 478; *see also Sears v. Upton*, 561 U.S. 945, 955 (2010) ("[T]he *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below."); *Wiggins*, 539 U.S. at 533 (explaining that counsel's performance "must be directly assessed for reasonableness in all the circumstances").  And "[t]he relevant question is not whether counsel's choices were *strategic*, but whether they were *reasonable*" under the circumstances.  *Flores-Ortega*, 528 U.S. at 481 (emphases added).  Indeed, "'[s]trategic' decisions can be unreasonable depending on the circumstances and therefore deficient under *Strickland*."  *Issa v. Bradshaw*, 904 F.3d 446, 461 (6th Cir. 2018) (Merritt, J., concurring).

The lower courts did not perform that analysis here.  After concluding that these types of decisions generally are "tactical," the courts ended their inquiry.

29

Order, R. 31, PageID # 13136–37. And the courts similarly failed to grapple with the Supreme Court's clear instructions regarding the importance of lawyer argument. *See supra* at 22–23. The state court's decision was therefore contrary to—and an unreasonable application of—clearly established federal law, and the district court erred in holding otherwise. 28 U.S.C. § 2254(d)(1).

Additionally, the cases upon which the state court and the district court relied bear no resemblance to Ms. Roberts' case. In *Yarborough v. Gentry*, for example, defense counsel *made* a closing argument; the petitioner's allegation was simply that it was not good enough. 540 U.S. 1, 3–11 (2003). The Court rejected that argument because "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Id.* at 8. Here, counsel focused on *no* issues during lawyer argument— because counsel declined it altogether. *Yarborough*, in fact, further supports why that was deficient. The Supreme Court made clear that "[t]he right to effective assistance extends to closing arguments" and "[c]losing arguments should 'sharpen and clarify the issues for resolution by the trier of fact.'" *Id.* at 5–6 (quoting *Herring*, 422 U.S. at 862). Defense counsel ignored that guidance here.

*Tinsley v. Million* is likewise inapplicable. 399 F.3d 796, 811 (6th Cir. 2005). In that case, it was not clear from the record whether the prosecution and the defense gave a closing argument; and defense counsel testified "that he always gave one, he

assumed that he gave one here and he would only have waived a closing argument if there were a good reason for doing so." *Id.* Moreover, Tinsley's claim was based on counsel's failure to give closing argument *during the penalty phase*, when the only thing that happened during the penalty phase was the prosecutor's introduction of "the rules on parole eligibility." *Id.* Accordingly, multiple problems plagued Tinsley's claim that are not relevant here.

The same is true for the remaining cases—none involved the complete failure to give opening and closing argument during the guilt phase of a capital trial. *See Millender v. Adams*, 376 F.3d 520, 524 (6th Cir. 2004) (counsel presented closing argument); *Moss v. Hofbauer*, 286 F.3d 851, 860 (6th Cir. 2002) (same); *State v. Bradley*, 538 N.E.2d 373, 381 (Ohio 1989) (same); *State v. Fouts*, 2016-Ohio-1104, at ¶¶ 49, 69–70 (Ohio Ct. App. 2016) (counsel presented both an opening statement and a closing argument); *State v. Belton*, 74 N.E.3d 319, 350 (Ohio 2016) (counsel waived *only* opening statements during the penalty phase, and that was after the prosecutor had already waived his own opening statement). Accordingly, the lower courts' reasoning regarding "tactics" has no merit.

### b.   Nothing in the record suggests Ms. Roberts waived opening and closing argument during the guilt phase.

In denying Ms. Roberts' claim, the state court also reasoned that, given Ms. Roberts' later mitigation waiver in the penalty phase, "it is not unreasonable to infer that the character or personality of the[] client influenced the manner in which they

31

chose to proceed at trial." Order, R. 31, PageID # 13136. The district court similarly invoked Ms. Roberts' "judgment and behavior during trial and her admitted instructions to counsel that they not participate in any manner in the mitigation phase of trial." *Id.* at PageID # 13138.

These conclusions are wrong, and unreasonably so. To the extent the state court was suggesting that Ms. Roberts' counsel could provide sub-par representation given her general "character or personality," that is (of course) incorrect. It should go without saying that the constitutional right to effective counsel does not depend on whether the client has an agreeable or likeable "character or personality."

To the extent the courts were instead suggesting, more specifically, that Ms. Roberts directed counsel to forego opening and closing *in the guilt phase*, that is equally unreasonable. As an initial matter, the decision as to whether to present lawyer argument is a decision *for counsel*, not the client. *See McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018) ("Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as '*what arguments to pursue*, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" (emphasis added) (quoting *Gonzalez v. United States*, 553 U.S. 242, 248 (2008)). Thus, it is irrelevant whether Ms. Roberts wanted counsel to forego lawyer argument.

In any event, and even more importantly, nothing in the record supports an inference that she directed counsel to forego argument during the guilt phase. That renders the state court's decision unreasonable under 28 U.S.C. § 2254(d)(2). *See Ward v. Sternes*, 334 F.3d 696, 703–05 (7th Cir. 2003) (Section 2254(d) is met where the state court's finding was "inadequately supported by the record"); *Amado v. Gonzalez*, 758 F.3d 1119, 1136 (9th Cir. 2014) (state court made an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2) where "[t]here was nothing in the record that could support" its finding).

If anything, the record *contradicts* any inference that she instructed counsel to forego guilt-phase argument. The opening statement was (of course) scheduled for the beginning of trial, and counsel afterwards participated in the trial process. So it beggars belief that Ms. Roberts would insist that counsel waive opening statement but then, for example, direct them to cross-examine witnesses. Moreover, where Ms. Roberts directed her counsel to forego participating *in the penalty phase*, counsel made clear *on the record* that they were waiving argument *at their client's direction*. *See* Trial Tr., R. 11-3, PageID # 6531 ("Pursuant to Donna's instructions, the Defense will waive opening statement."); *Id.* at PageID # 6588 ("I am instructed to waive argument and have no choice but to abide by that instruction."). Yet counsel made no such on-the-record statement when they waived lawyer arguments during the guilt phase. *Id.* at PageID # 5364–65, 6425–26.

33

Moreover, Ms. Roberts provided an affidavit confirming that she did *not* waive guilt-phase lawyer arguments.  Roberts Aff., R. 12-13, PageID # 10253–54.  In discounting this affidavit, the district court noted that courts "routinely afford little weight to assertions made in a petitioner's affidavit that are unsupported by other credible evidence."  Order, R. 31, PageID # 13137–38.  But in the cases cited by the court, the sole *premise* of the petitioner's claim was contained in a self-serving affidavit, and the affidavit *contradicted* on-the-record information.  *See Thomas v. Perry*, 553 F. App'x 485, 487 (6th Cir. 2014) (defendant's self-serving affidavit claiming he was coerced into waiving his jury right contradicted record showing that he signed a written waiver and orally affirmed that waiver in open court); *Highers v. Kapture*, 93 F. App'x 48, 50 (6th Cir. 2004) (nothing in the record showed that defense counsel promised a certain result when the defendant agreed to waive a jury trial); *Hawkins v. Woods*, No. 2:08-cv-12281, 2015 WL 348530, at *2, 5 (E.D. Mich. Jan. 26, 2015) (counsel not ineffective for failing to call alibi witnesses when defendant provided no independent evidence of what the witnesses would have said, and counsel stated on the record that he was not calling the witnesses because they were uncooperative); *Jackson v. United States*, 248 F. Supp. 2d 652, 655–56 (E.D. Mich. 2003) (discounting the affidavit only because the judge had already witnessed the petitioner's "proclivity to lie," and the affidavit squarely contradicted other record evidence).

Here, by contrast, the premise of Ms. Roberts' claim is that counsel failed to present opening and closing argument, and nobody disputes that. It was the state court that first speculated about *why* counsel failed to do so, suggesting that perhaps they were following instructions from their client. But (as explained above) that speculation is wholly unsupported, and contradicted, by the record. Accordingly, none of the cited cases are relevant here.

Additionally, to the extent the lower courts faulted Ms. Roberts for not amassing *more* evidence to support her claim, that too is unreasonable. Ms. Roberts asked the state court for evidentiary development on this claim, but the state court denied that request. Mot. to Conduct Discovery, R. 12-13, PageID # 10420–22. And "[w]here a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, 'the fact-finding process itself is deficient' and not entitled to deference." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Hurles v. Ryan*, 752 F.3d 768, 790–91 (9th Cir. 2014)). Making matters worse, the district court did not permit Ms. Roberts to even *move* for evidentiary development during her habeas proceedings. Mot. to Amend., R. 32, PageID # 13188–91; Order, R. 35, PageID # 13205–06; *see supra* at 16–17.

In the end, then, the lower courts' speculation regarding waiver is unreasonable and unsupported by the record.

### c. The state court did not adjudicate the prejudice prong, which should be reviewed *de novo*.

Finally, the lower courts' decisions with respect to the prejudice prong are, at the very least, "debatable." The state court determined only that counsel's performance was not deficient. Its lone assessment of "prejudice" was in stating that "*[t]he affidavit* submitted by Roberts provides no support either for counsel's deficiency or prejudice resulting from counsel's performance." Order, R. 31, PageID # 13136. Because the state court offered no ultimate holding on the prejudice issue, this prong is reviewed *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*." (internal citation omitted)); *see also Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012) ("[I]n the situation where the state court adjudication relies upon only one [*Strickland*] prong, deference has no proper role in reviewing the remaining prong."). For its part, the district court summarily disposed of the prejudice prong. Order, R. 31, PageID # 13138–39.

To the extent these dispositions can be called holdings, they are wrong—Ms. Roberts has demonstrated prejudice for the reasons explained above. *See supra* at 24–28. Ms. Roberts has therefore shown that her ineffective-assistance-of-counsel claim has merit and is "adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 484.

### B. Counsel's deficient performance during the penalty phase of trial prejudiced Ms. Roberts (Second and Third Claims for Relief).

Counsel's deficiencies persisted through the penalty phase of trial. Contrary to well-worn professional standards, counsel failed to thoroughly investigate mitigating evidence and adequately advise Ms. Roberts about the penalty phase of trial. As a result, Ms. Roberts—overwhelmed by the guilty verdict, misinformed about the purpose of mitigating evidence, and suffering from mental illness—instructed counsel not to present mitigation evidence independent of her own unsworn statement. Had counsel performed according to professional standards, there is a reasonable probability that Ms. Roberts would have permitted counsel to present independent mitigating evidence and that at least one juror would have voted in favor of a life sentence. This claim is therefore adequate to proceed further.

### 1. Counsel failed to adequately investigate the mitigation evidence and advise Ms. Roberts about the penalty phase.

Defense attorneys have myriad professional duties during the penalty phase of a capital trial. Start first with the duty to investigate. "It is unquestioned that under prevailing professional norms at the time of [Ms. Roberts'] trial, counsel had an obligation to conduct a thorough investigation of [her] background" in preparation for sentencing. *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (quoting *Porter v. McCollum*, 558 U.S. 30, 39 (2009)). The ABA Standards—which the Supreme Court has long referred to as "guides to determining what is reasonable"—

provide that "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (emphasis omitted) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)). "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant." *Blystone v. Horn*, 664 F.3d 397, 420 (3d Cir. 2011) (quoting ABA Standards for Criminal Justice 4-4.1 (1980)).

Counsel also must consult with and advise the defendant so that she can make fully informed decisions about her options at sentencing. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984) (counsel has duty to "consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution"). The duty to investigate and advise the client go hand-in-hand: "unless counsel has first conducted a thorough investigation," counsel "cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions." *Hamblin v. Mitchell*, 354 F.3d 482, 492 (6th Cir. 2003) (quoting ABA Guidelines § 10.7 (2003)).

These principles specifically apply to a client's decision to waive mitigation at a capital trial. Counsel has "a duty to provide advice upon which his client can make an informed decision not to present evidence in mitigation" and "counsel cannot fulfill this duty without first knowing what mitigating circumstances may exist." *Blystone*, 664 F.3d at 422 n.21; *see also Douglas v. Woodford*, 316 F.3d 1079, 1089 (9th Cir. 2003) ("It is, of course, difficult for an attorney to advise a client of the prospects of success or the potential consequences of failing to present mitigating evidence when the attorney does not know that such evidence exists."). Likewise, "[a]ttorneys must 'maintain constitutionally adequate contact [and] engage in constitutionally adequate consultation' in preparation for the penalty phase." *Sanders v. Davis*, 23 F.4th 966, 990 (9th Cir. 2022) (citing, inter alia, ABA Standards for Criminal Justice 4-3.8 (1980)). "Counsel must 'be familiar with the sentencing alternatives available to the court' and fully explain to his client '[t]he consequences of the various dispositions available'" as well as "what each sentencing option 'will mean for the defendant personally.'" *Id.* at 988–89 (quoting ABA Standards for Criminal Justice 4-8.1(a) (1980)). This includes "competently advis[ing] [the client] regarding the meaning of mitigation evidence." *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001).

These duties are particularly acute where the client has a history of mental illness, because "a person with a mental disorder may be reluctant to recognize his

own problems." *Douglas*, 316 F.3d at 1090 n.4; *see also Blanco v. Singletary*, 943 F.2d 1477, 1502 n.121 (11th Cir. 1991) ("An attorney has expanded duties when representing a client whose condition prevents him from exercising proper judgment.").

Additionally, and important to this case, "[a] defendant's desires not to present mitigating evidence do not terminate counsel's responsibilities during the sentencing phase of a death penalty trial." *Adams v. Quarterman*, 324 F. App'x 340, 347 (5th Cir. 2009) (quoting *Wood v. Quarterman*, 491 F.3d 196, 203 n.7 (5th Cir. 2007)). "The reason lawyers may not 'blindly follow' such commands is that although the decision whether to use such evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit." *Id.* The ABA standards make this clear. They provide that "[t]he investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." *Coleman v. Mitchell*, 268 F.3d 417, 450 (6th Cir. 2001) (quoting ABA Guidelines § 11.4.1.c (1989)). Numerous courts have also recognized this requirement. *See id.; see also Porter*, 558 U.S. at 40 ("Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct some sort of mitigation investigation."); *Hamblin*, 354 F.3d at 492 ("ABA and judicial standards do not permit the courts to excuse counsel's failure to investigate or prepare because the

40

defendant so requested."); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000) ("[R]eluctance on [the defendant's] part to present a mental health defense or to testify should not preclude counsel's investigation of these potential [mitigating] factors."); *Blystone*, 664 F.3d at 422 & n.21 ("Counsel cannot avoid the consequences of his inadequate preparation simply by virtue of the serendipitous occurrence that, on the day of sentencing, his client stuck with the decision not to go forward with a mitigation case."); *Sanders*, 23 F.4th at 984 ("Although a client may direct his attorney not to conduct a mitigation investigation, that direction does not relieve counsel of the obligation to conduct an investigation.").

When attorneys have fallen short of the above standards, courts have not hesitated to grant habeas relief and vacate the petitioner's sentence. *See, e.g.*, *Wiggins*, 539 U.S. at 520–38; *Porter*, 558 U.S. at 38–44; *Carter*, 218 F.3d at 591–600, 608–09; *Coleman*, 268 F.3d at 445–54; *Hamblin*, 354 F.3d at 490–94; *Sanders*, 23 F.4th at 983–96; *Battenfield*, 236 F.3d at 1226–36; *Blystone*, 664 F.3d at 418–28; *Douglas*, 316 F.3d at 1088–91; *Adams*, 324 F. App'x at 344–52; *Blanco*, 943 F.2d at 1500–06; *Hardwick v. Sec'y*, 803 F.3d 541, 551–65 (11th Cir. 2015).

Here, Ms. Roberts' trial counsel shirked these obligations. For one, counsel did not conduct a constitutionally sufficient mitigation investigation. They failed to take the necessary time to speak to family members, and Ms. Roberts herself, about her upbringing and background. Ms. Roberts' sister Janice averred that she had

"little to no communication" with Ms. Roberts' attorneys. Perry Aff., R. 12-13 PageID # 10257. Ms. Roberts' son Michael similarly attested that, "before or during trial," Ms. Roberts' counsel "did not ask" him about any of the information he could provide. Raymond Aff., R. 12-13, PageID # 10267. The information contained in these affidavits would have served to humanize Ms. Roberts from the perspective of close family members. *See supra* at 15.

Counsel also failed to uncover the extent of Ms. Roberts' significant history of head injuries, abuse, and mental-health issues. *See supra* at 10–15. None of Ms. Roberts' family or social history, including her troubled upbringing and past sexual abuse, was mentioned during discussions about Ms. Roberts' waiver. *See* Trial Tr., R. 11-3, PageID # 6503–04. Likewise unmentioned was her bipolar diagnosis, suicide attempt, and the fact that she was on social-security income due to her mental illnesses. *Id.*

Counsel also failed to communicate with Ms. Roberts—throughout the representation—about the strategy and purpose of mitigation, and failed to develop a trusting and open relationship such that she would have followed advice to present mitigating evidence independent from her unsworn statement. Counsel told the court that they spent only five days at the end of (or after) the guilt phase discussing with Ms. Roberts her decision to waive mitigation. Trial Tr., R. 11-3, PageID # 6503. That was insufficient. Counsel has a duty to "work to establish a relationship

42

of trust and confidence with" their client and, "*at an early stage*, . . . discuss with the client the objectives of the representation." ABA Standards for Criminal Justice, Defense Function 4-3.1 (emphasis added). That is why, for example, the court in *Sanders v. Davis* held that counsel was ineffective even where counsel "spent [a] four-day period discussing with [defendant] his objection to presenting a penalty phase defense"—because counsel failed "to advise [the defendant] about the penalty phase *throughout the course of his representation*." 23 F.4th at 973–91 (emphasis added). As the court explained, capital defense attorneys understand that "it takes clients time—sometimes months—to fully comprehend and make deliberate decisions about the penalty phase, thus requiring counsel to start conversations with a defendant about the penalty phase early on in the litigation." *Id.* at 990.

Counsel for Ms. Roberts similarly did not take the proper time throughout the case to prepare her for the prospect of a penalty phase, and so Ms. Roberts (already with a history of mental illness) was emotionally overwhelmed by the guilty verdict such that she could not make rational decisions about mitigation. *See Blanco*, 943 F.2d at 1502 ("During the precise period when Blanco's lawyers finally got around to preparing his penalty phase case, Blanco was noticeably morose and irrational. Counsel therefore had a greater obligation to investigate and analyze available mitigation evidence."); *see also id.* at 1502 n.121 ("An attorney has expanded duties when representing a client whose condition prevents him from exercising proper

judgment."). Her "defiant opposition to presenting a penalty phase defense following the guilty verdict likely would have looked different had [counsel] adequately advised [her] over the course of their attorney-client relationship." *Sanders*, 23 F.4th at 992.

Furthermore, once counsel was forced to confront this issue, counsel had options other than barreling through the sentencing phase. Ms. Roberts was angered by the outcome of her trial. Yet counsel failed to request a continuance of the penalty phase so that the Ms. Roberts could calmly consider her fate for sentencing.

Compounding the problem, Ms. Roberts also clearly misunderstood the purpose of mitigating evidence. In her view, mitigating evidence served as an admission of guilt or a plea for her life, something she objected to. *See, e.g.*, Trial Tr., R. 11-3, PageID # 6534, 6548, 6573. Counsel should have explained to her, however, that mitigation is simply a way for the jury to get to know her as a person. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (explaining that the purpose of mitigating evidence is to ensure that the jury "treat[s] the defendant as a 'uniquely individual human being'" (brackets omitted)), *partially abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). Given the content of her unsworn statement, that was a goal she desired. *See, e.g.*, Trial Tr., R. 11-3, PageID # 6536, 6546–48, 6562–63, 6564, 6577–78; *see also, e.g.*, *id.* at 6547 ("But the most

important thing I don't have is Robert, and my two little girls. I want you to look at them. This is Fluffy and Blossom. Pass it down. Get to know me more.").

To top it off, counsel went so far as to readily and openly agree that Ms. Roberts was competent to waive her mitigation hearing. *See* Trial Tr., R. 11-3, PageID # 6504–06. They did so despite their knowledge that she suffered debilitating mental health issues and despite the fact that they waived questioning of Dr. Eberle at the competency hearing. *See supra* at 5–7. And counsel's actions certainly played into the court's decision to find Ms. Roberts competent. *See Drope v. Missouri*, 420 U.S. 162, 178 n.13 (1975) (explaining that "a lawyer's representations concerning the competence of his client" are "unquestionably a factor which should be considered").

In the end, the record shows that "[t]he ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation, but was instead primarily a result of counsels' eagerness to latch onto [Ms. Roberts'] statements that [s]he did not want any witnesses called." *Blanco*, 943 F.2d at 1503.

## 2. Counsel's failures during the penalty phase prejudiced Ms. Roberts.

Had counsel worked to unearth mitigating evidence and fully advised Ms. Roberts regarding the penalty phase, there is a "reasonable probability" that: (1) Ms. Roberts would have agreed to the presentation of independent mitigating evidence; and (2) the outcome of the penalty phase would have been different.

In assessing prejudice during the penalty phase, the court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. "[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also supra* at 18–19.

Furthermore, in Ohio, the jury must "*unanimously* find, by proof beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors." Trial Tr., R. 11-3, PageID # 6593 (emphasis added); *see* Ohio Rev. Code § 2929.03(D)(2). Thus, to prove *Strickland* prejudice, Ms. Roberts need only show there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537; *see also Hamblin*, 354 F.3d at 493 ("In our view, had the available evidence been presented . . . at least one juror would have voted against the death penalty.").

In cases where counsel's ineffectiveness is alleged to have contributed to a mitigation waiver, courts also consider whether "there is a reasonable likelihood that [defendant] would have changed his mind had [counsel] provided effective assistance." *Sanders*, 23 F.4th at 991; *see also, e.g.*, *Battenfield*, 236 F.3d at 1230

(finding *Strickland* prejudice where counsel's "deficient performance culminated in [the client] waiving the right to present mitigating evidence").

Applying these standards, it is reasonably likely that Ms. Roberts would have permitted counsel to present independent mitigating evidence had counsel performed up to professional standards. "[M]any death-eligible defendants initially reject the idea of an LWOP sentence, but most change their minds with competent representation." *Sanders*, 23 F.4th at 991; *see also id.* at 979 (studies show that "70% of death-eligible clients [] interviewed initially said they would prefer death to LWOP, and thus did not want to present mitigating evidence, but that every one of [those] clients who initially expressed this position ended up changing their minds"). And oftentimes "the client's seeing the results of positive mitigation evidence . . . begins to soften [her] resistance to a penalty defense." *Id.* at 991.

Here, "there is nothing in [Ms. Roberts'] background that suggests [s]he would have been the rare defendant who would not have changed [her] mind." *Id.* at 992. Ms. Roberts desired to present *some* mitigating evidence in the form of her unsworn statement; so this is not a case where the defendant wished to forego mitigation completely. Moreover, once she received new counsel, she desired to present full mitigation evidence at resentencing. *See supra* at 8–9. All of this indicates that, had counsel adequately investigated and advised Ms. Roberts

throughout the course of the representation, it is reasonably likely she would have permitted counsel to introduce independent mitigating evidence.

Moreover, had this evidence been presented, it is reasonably likely that at least one juror would have struck a different balance and voted in favor of a life sentence. The evidence regarding Ms. Roberts' upbringing, history of sexual abuse, her relationship to her sister and son, her charity work, her car accidents, and her mental health problems, including her bipolar diagnosis, is all classic mitigation evidence. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry*, 492 U.S. at 319. Indeed, the Ohio legislature has recently determined that bipolar disorder is a "serious mental illness" such that someone suffering from it at the time of the crime is ineligible for the death penalty. *See* Ohio Rev. Code 2929.025(A)(1); *State v. Ahmed*, 2023-Ohio-3464, ¶ 5 (Ohio Ct. App. 2023). This diagnosis also would have provided the necessary context for Ms. Roberts' behavior vis-à-vis Mr. Jackson and her behavior following Mr. Fingerhut's death. *See supra* at 3–4.

Ms. Roberts' unsworn statement to the jury was not a substitute for full presentation of this independent mitigating evidence. Her statement was uncorroborated; no independent mitigation evidence was presented. And the

statement did not cover her bipolar diagnosis, her mental health problems more generally, and her upbringing. Rather, it was mostly a rambling critique of the guilt-phase evidence. Trial Tr., R. 11-3, PageID # 6532–79. Making matters worse, Ms. Roberts incorrectly instructed the jury on the law. She said that her unsworn statement "doesn't count" as mitigating evidence. Trial Tr., R. 11-3, PageID # 6544; *but see State v. Roberts*, 850 N.E.2d 1168, 1186 (Ohio 2006) (explaining that "Roberts presented an unsworn statement" and "[a]n unsworn statement can constitute critical mitigating evidence."). She said that, because she did not present mitigating evidence, the jury was "bound by law" to give her a death sentence. Trial Tr., R. 11-3, PageID # 6574; *but see State v. Ashworth*, 706 N.E.2d 1231, 1239–40 (Ohio 1999) (explaining that a judge would be "mistaken" to believe "that if no mitigating evidence was presented in a penalty phase hearing, there would be no choice but to enter a death sentence"); *State v. Jordan*, 804 N.E.2d 1, 16 (Ohio 2004) (disagreeing that, if a defendant presents no mitigation, "the only lawful jury verdict would be death"). And she told the jury that it was prohibited from considering that she was not the triggerman. Trial Tr., R. 11-3, PageID # 6574; *but see* Ohio Rev. Code § 2929.04(B)(6) (providing that sentencer "shall consider . . . "[i]f the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense"). Given all this, "there is a reasonable possibility that the jury concluded or determined that they had no choice

49

but to impose a death sentence." *Sanders*, 23 F.4th at 995.  And this could have been corrected if counsel had properly advised her throughout the representation and effectively presented a mitigation case, including opening and closing argument.

Moreover, compared to other capital cases, the State's aggravation case against Ms. Roberts was relatively modest.  *See Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."); *Waidla v. Davis*, 68 F.4th 575, 594 (9th Cir. 2023) (finding prejudice where counsel "missed [the] opportunity to rebut various aspects of the State's aggravation argument, which was itself modest").  She had no criminal history of violence, was not the principal offender, and the crime did not involve multiple or child victims.  *See* Ohio Rev. Code § 2929.04(A).

Finally, it bears mentioning that the court must consider the cumulative effect of counsel's deficient performance, rather than considering each error on its own.  *See Strickland*, 466 U.S. at 695–96 (defendant must show that "the decision reached would reasonably likely have been different absent *the errors*" (emphasis added)); *see also Hewitt-El v. Burgess*, 53 F.4th 969, 981 (6th Cir. 2022) ("We therefore consider the cumulative effect of Cross's deficient performance."); *Mackey v. Russell*, 148 F. App'x 355, 365 (6th Cir. 2005) ("[T]he *Strickland* test requires that prejudice be evaluated in light of the cumulative effect of all constitutionally infirm actions by counsel.").  Indeed, because "sentencing proceedings may be affected by

errors in the preceding guilt phase," a petitioner's "claim of error at the penalty phase may be cumulated with guilt-phase error." *Cargle*, 317 F.3d at 1208. Here, the same jury that witnessed defense counsel forego opening and closing argument during the guilt phase was the one who sentenced Ms. Roberts to death. Accordingly, counsel's guilt-phase errors should factor into the prejudice analysis as well. *Supra* at 20–28.

### 3. The district court's assessment of this claim is wrong and, at the very least, debatable.

The district court incorrectly adjudicated this claim.

First, the district court wrongly concluded that a subpart of this penalty-phase claim (the investigation aspect of the claim) is procedurally defaulted. Though it assumed Ms. Roberts had shown cause for the default based on the state court's ordering counsel to withdraw the claim, the court held that Ms. Roberts had "made no attempt to demonstrate actual prejudice" and therefore "forfeit[ed] the issue." Order, R. 31, PageID # 13122. This Circuit, however, has long held that the standard for showing prejudice to excuse a procedural default is the same as the standard for showing prejudice under *Strickland*. *See Hall v. Vasbinder*, 563 F.3d 222, 237 (6th Cir. 2009) ("[E]stablishing *Strickland* prejudice likewise establishes prejudice for purposes of cause and prejudice." (quoting *Joseph v. Coyle*, 469 F.3d 441, 462–63 (6th Cir. 2006)); *Chase v. Macauley*, 971 F.3d 582, 595 (6th Cir. 2020) ("To establish sufficient prejudice under *Strickland*, and, in turn, overcome procedural default, a petitioner must show a 'reasonable probability' that, but for her counsel's

errors, a different result likely would have occurred." (quotation marks omitted)).
Other circuits agree that the standard is the same. *See, e.g.*, *Thomas v. Payne*, 960
F.3d 465, 477 (8th Cir. 2020); *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682,
688 (11th Cir. 2017). Ms. Roberts clearly argued prejudice under the *Strickland*
standard. *See* Petition, R. 10, PageID # 109–20; Traverse, R. 24, PageID # 12945–
53. So the district court was mistaken when it found the issue forfeited and the claim
procedurally defaulted. At the very least, "jurists of reason would find it debatable
whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at
484.

Second, the district court was wrong on the merits of the claim. With respect
to the investigation aspect of the claim, which the court reviewed *de novo*, the court
held that Ms. Roberts "presumably would have refused to testify on her own behalf
at the mitigation hearing or cooperate with counsel in any further investigation and
identification of mitigation evidence." Order, R. 31, PageID # 13128. But the record
shows that Ms. Roberts purportedly waived only the *presentation* of mitigation
evidence—nothing in the record even suggests that she stymied counsel's
*investigation*. That serves to distinguish the two cases cited by the district court.
*See Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001) (case decided pre-
*Wiggins*, and defendant instructed his counsel "not to investigate possible mitigating
factors"); *Owens v. Guida*, 549 F.3d 399, 407 (6th Cir. 2008) (defendant "refused to

let her attorneys interview her family members" and family members testified that they would not "have wanted to testify even if they had been asked"); *see also Sanders*, 23 F.4th at 984 (distinguishing *Owens* on these grounds). Moreover, in both of those cases, some independent mitigating evidence *was* presented during the penalty phase. *See Owens*, 549 F.3d at 403 (counsel presented testimony from a psychiatrist and jail employees); *Coleman*, 244 F.3d at 545 (residual doubt presentation). And neither of those cases addressed the point that the failure to investigate can itself contribute to a waiver. *See supra* at 46–47.

The district court also held that "[g]iven Roberts' intransigent behavior at trial and explicit instructions to her counsel to forgo the presentation of mitigation evidence, it is reasonable to assume she would not have permitted the evidence's introduction even if counsel had obtained it." Order, R. 31, PageID # 13129. Ms. Roberts already explained, however, why this assumption is unreasonable. *See supra* at 46–48. And the cases cited by the district court are again inapposite. Unlike here, counsel in *Henness v. Bagley* "conducted a thorough investigation into potential mitigating factors," including speaking with numerous family members on multiple occasions and hiring a psychologist, and counsel even "presented several witnesses during the mitigation phase." 644 F.3d 308, 323 (6th Cir. 2011).

Nor is this case analogous to *Schriro v. Landrigan*, 550 U.S. 465 (2007). "In the constellation of refusals to have mitigating evidence presented . . . th[at] case is

surely a bright star." *Id.* at 477. The defendant there forbade *all* mitigating evidence, and even "interrupted repeatedly when counsel tried to proffer anything that could have been considered mitigating." *Id.* at 476–77. Here, by contrast, Ms. Roberts did not waive all mitigating evidence—she still provided an unsworn statement. *See Roberts*, 850 N.E.2d at 1186 (explaining that "Roberts presented an unsworn statement" and "[a]n unsworn statement can constitute critical mitigating evidence."). Unlike Mr. Landrigan, Ms. Roberts clearly wanted her story told and was confused about the purpose of mitigating evidence. *See supra* at 44–45. Moreover, after Ms. Roberts obtained new representation, she desired to present full mitigating evidence at resentencing. *See Hardwick*, 803 F.3d at 563 (finding *Landrigan* inapplicable because the defendant's "actions, including his continued efforts to seek a life sentence, further support th[e] finding" of prejudice (brackets omitted)). And in *Landrigan*, "the petitioner was certainly aware that other types of mitigating evidence could be presented on his behalf, since nearly all of the evidence that the petitioner claimed would have been uncovered in an adequate investigation was in fact proffered to the judge—over the interruptions of the petitioner—at sentencing." *Blystone*, 664 F.3d at 426 (distinguishing *Landrigan* on this ground). Not so here. Again, Ms. Roberts' counsel failed to uncover numerous important aspects of her background and mental health. *See supra* at 42.

At bottom, *Landrigan* simply held that *prejudice* had not been shown *given the facts of that case*. It "did not change an attorney's obligation to conduct a mitigation investigation when a client objects to presenting a mitigation defense." *Sanders*, 23 F.4th at 984. Nor did it "address whether counsel's professional obligations beyond conducting a competent mitigation investigation could have changed his client's mind." *Id.* at 982. And there are a variety of "duties related to the penalty phase beyond the duty to investigate mitigating evidence, including the duty to inform and advise a client in preparation for the penalty phase trial." *Id.* Again, these duties are heightened in the face of a client with a known history of mental illness. *See supra* at 39–40. Counsel here failed in those duties. Thus, *Schriro* has little to say here.

The lower courts were equally mistaken with respect to the waiver aspect of Ms. Roberts' claim. The state court's only reason for rejecting this claim was that Ms. Roberts "understood what she was doing" when she waived mitigating evidence because she "wanted to be given a death sentence," and "[a]n attorney does not render ineffective assistance by declining, in deference to a client's desires, to present evidence in mitigation." Order, R. 31, PageID # 13130. The district court found this decision reasonable. It agreed that Ms. Roberts' waiver was "knowingly, voluntarily, and intelligently made" because she "understood the nature of her right to present mitigation evidence and the consequences of forgoing that right." *Id.* at

PageID # 13131. But these courts focused on the wrong inquiry. The question, for purposes of this ineffective-assistance-of-counsel claim, is not whether Ms. Roberts' waiver was invalid. It is whether counsel performed ineffectively, and whether that ineffectiveness contributed to her ultimate waiver. *See supra* at 46–47.

Regardless, the district court's holding is misguided on its own terms. The district court noted that trial counsel "spent five days discussing with Roberts her decision to waive the presentation of mitigation evidence," Order, R. 31, PageID # 13131, but Ms. Roberts has already shown why that was insufficient, *see supra* at 42–43. The district court also stated that counsel "explained 'the exact nature' of the evidence they sought to introduce," Order, R. 31, PageID # 13131, but (again) that evidence was far from complete, *see supra* at 42. Finally, the district court noted that the trial court advised Ms. Roberts about the likelihood of the death penalty, Order, R. 31, PageID # 13131, but that does not address Ms. Roberts' misunderstanding on the purpose of mitigating evidence, nor does it address her attorneys' failures leading up to the waiver. Indeed, during this colloquy, the trial court admitted that it had "no idea what that [mitigation] evidence would be," Trial Tr., R. 11-3, PageID # 6502, so this discussion was in no way a substitute for competent attorney advisement regarding the penalty phase.

All told, this claim has merit and is at least debatable. This Court should therefore grant a COA on this claim.

## II.      This Court should grant a COA on Ms. Roberts' claim regarding her incompetency at resentencing (Seventh Claim for Relief).

The Constitution forbids the trial and sentencing of an incompetent defendant. By extension, the Supreme Court has made clear that a defendant must be provided a meaningful opportunity to present evidence demonstrating her incompetence. Thus, where a reasonable judge would experience doubt about a defendant's competence, the defendant is entitled to a full and fair hearing on the issue. Ms. Roberts was denied this full and fair hearing at her resentencing proceedings. The district court's contrary holding is wrong and, at the very least, debatable. Moreover, no procedural doctrines bar Ms. Roberts' resentencing competency claim. *See* Order, R. 31, PageID # 13153. Accordingly, a COA should issue on this claim.

### A.    The trial court deprived Ms. Roberts of a reasonable opportunity to demonstrate incompetence at resentencing, thereby violating Ms. Roberts' due-process rights.

It is well-settled that the "criminal trial of an incompetent defendant violates due process." *Medina v. California*, 505 U.S. 437, 453 (1992). This "prohibition is fundamental to an adversary system of justice." *Drope v. Missouri*, 420 U.S. 162, 172 (1975). A corollary to this principle is that "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives h[er] of h[er] due process right to a fair trial." *Id.* Those procedural due-process rights are violated when the defendant is deprived of a "reasonable opportunity to demonstrate that [s]he is not competent to stand trial."

*Medina*, 505 U.S. at 451. A "reasonable opportunity" is one that assures the defendant "a fair opportunity to present [the] defense" and "to participate meaningfully in [the] judicial proceedings." *Id.* at 445.

This type of "procedural competency claim" (one that alleges a "failure to hold a competency hearing, or an adequate competency hearing") is "held to a lower burden of proof than one raising a substantive competency claim" (one that alleges that the defendant "was tried and convicted while, in fact, incompetent"). *McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001); *see also Walton v. Angelone*, 321 F.3d 442, 459–60 (4th Cir. 2003) (discussing procedural and substantive competency claims); *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005) (same). To prevail on a procedural incompetency claim, the defendant need only show that "a reasonable judge . . . should have experienced doubt with respect to competency to stand trial." *Mackey v. Dutton*, 217 F.3d 399, 413–14 (6th Cir. 2000); *see also Drope*, 420 U.S. at 173 (hearing required "where the evidence raised a 'bona fide doubt' as to a defendant's competence"). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but [] even one of these factors standing alone may, in some circumstances, be sufficient." *Drope*, 420 U.S. at 180. Additionally, the right to an adequate competency determination persists throughout trial; thus, "[e]ven when a defendant is competent

58

at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Id.* at 181.

Also well settled is the substantive standard for competency. The trial court must determine whether the defendant "has sufficient present ability to consult with h[er] lawyer with a reasonable degree of rational understanding—and whether [s]he has a rational as well as factual understanding of the proceedings against h[er]." *Dusky v. United States*, 362 U.S. 402, 402 (1960).

Here, the record reveals that any reasonable judge would have "experienced doubt" with respect to Ms. Roberts' competency at the time of her resentencing. *Mackey*, 217 F.3d at 413. Ms. Roberts' competency was questioned during the guilt phase of trial when, based on her in-court appearance and behavior, her medications needed to be adjusted. *See supra* at 5–6. And before resentencing proceedings, the prosecution itself recognized that there was not "any question" that the court was obliged "to determine that she's competent before we can [re]sentence her." Resentencing Tr., R. 11-4, PageID # 6672. Moreover, prior to the competency hearing, counsel had proffered hundreds of pages of mental-health records

identifying her long history of depression, bipolar disorder, documented head traumas, suicidal ideations, hallucinations, and delusional thinking. *See supra* at 9.[5]

Accordingly, Ms. Roberts was entitled to a full and fair competency hearing. *Drope*, 420 U.S. at 173; *Medina*, 505 U.S. at 451. That did not occur here. Resentencing counsel repeatedly requested that Ms. Roberts be evaluated by an independent expert, including (specifically) a neuropsychologist. *See* Resentencing Tr., R. 11-4, PageID # 6669, 6703–05; Mot. For Approp., R. 12-5, PageID # 8539–42, 8582–84; Mot. For Appoint., R. 12-5, PageID # 8701–02. The trial court denied those requests, simply stating it was "for another court and another day." Resentencing Tr., R. 11-4, PageID # 6703–06. Resentencing counsel therefore called no witnesses at the hearing. This type of one-sided hearing did not provide Ms. Roberts a "reasonable opportunity to demonstrate" incompetence and "participate meaningfully" in those proceedings. *Medina*, 505 U.S. at 451; *see also United States v. Williams*, 113 F.3d 1155, 1161 (10th Cir. 1997) (defendant must be given the opportunity to demonstrate incompetence "in the crucible of a full-blown evidentiary hearing"); *Cf. Barry v. Barchi*, 443 U.S. 55, 66 (1979) ("[T]he opportunity to be heard must be 'at a meaningful time and in a meaningful

---

[5] These are among the records that will be the subject of the forthcoming motion to expand the record on appeal. *See supra* at 12 n.2.

manner.'"").  Indeed, "a hearing that precludes full participation by the defendant is no hearing at all." *Lewis v. Zon*, 573 F. Supp. 2d 804, 818 (S.D.N.Y. 2008).

And Dr. Gazley's evaluation was far from adequate. Dr. Gazley simply reviewed Ms. Roberts' prison records for one hour and then spoke with her for two and a half hours.  Resentencing Tr., R. 11-4, PageID # 6681.  He spoke to none of her family members.  *Id.* at PageID # 6688–89.  He reviewed none of her mental-health records from before prison.  *Id.* at PageID # 6694–95.  He was unaware, for example, that Ms. Roberts had been receiving social-security benefits based on her mental illness, even though he admitted that prior mental-illness diagnoses are "what you would have to investigate to make [the competency] determination."  *Id.* at PageID # 6695–96.  He was unfamiliar with the details of Ms. Roberts' prior head injuries and admitted that he, as a "psychologist who is not a neuropsychologist,"[6] could not determine the severity and impact of her head injuries.  *Id.* at PageID # 6685–86, 6696–97.  And even as to Ms. Roberts' prison records, Dr. Gazley did not evaluate all the relevant information.  For example, he did not review the records showing that Ms. Roberts experienced hallucinations while on death row.  *Id.* at PageID # 6689–92.  Nor did he have any "direct observation of [Ms. Roberts'] ability to interact with defense counsel"—he simply assumed she was competent

---

[6] Given Ms. Roberts' history of head injuries, resentencing counsel specifically requested that Ms. Roberts be evaluated by a *neuropsychologist*.  *See* Mot. For Appoint., R. 12-5, PageID # 8701.  The court denied that motion.

based on her ability to communicate with *him* during the short time he spoke with her. *Id.* at PageID # 6688–89. Accordingly, Dr. Gazley's limited review—and the resulting hearing in which he was the sole witness—did not provide Ms. Roberts a "reasonable opportunity" to demonstrate her incompetence. *Medina*, 505 U.S. at 451.

**B.    The district court's assessment of this claim is wrong and, at a minimum, debatable.**

The state court denied Ms. Roberts' claim because "Dr. Gazley's testimony supports the trial court's finding that Roberts failed to prove by a preponderance of the evidence that she was not competent to stand trial at the time of her sentencing proceeding in 2007." *Roberts*, 998 N.E.2d at 1118. The court rejected Ms. Roberts' criticism of Dr. Gazley's opinion—specifically, his failure to evaluate her psychological history and the effects of a prior head injury—because Dr. Gazley's "evaluation was based on his interview with Roberts." *Id.* The court did not address Ms. Roberts' claim regarding the trial court's failure to permit examination by an independent neuropsychologist. *See* Order, R. 31, PageID # 13153, 13158–61. Accordingly, the state court did not address procedural incompetence, and no deference should be afforded its decision. In any event, any decision rejecting that claim would be "contrary to" or an "unreasonable application of" Supreme Court

authority, and an "unreasonable determination of the facts," for the reasons explained above.  18 U.S.C. § 2254(d).

In rejecting Ms. Roberts' habeas claim, the district court held that "the Ohio Supreme Court reasonably concluded that Roberts' 2007 competency hearing afforded her the 'basic procedural safeguards' that the Court has established are required for defendants to demonstrate incompetency."  Order, R. 31, PageID # 13162.  But again, the state court never decided the procedural incompetence claim, so it could not have "reasonably concluded" something it did not address.

In any event, the district court's conclusion on this front is also unsupported by the record and the law.  The district court noted that Dr. Gazley "review[ed] numerous records"—without acknowledging all the highly relevant records that Dr. Gazley *did not* review.  *Id.*; *see supra* at 61–62.  The district court also stated that the trial court "permitted defense counsel to supplement the record with additional mental-health records"—but that is simply incorrect.  Order, R. 31, PageID # 13162. The trial court permitted counsel to submit those records *only* as a proffer for purposes of developing an appellate record.  Resentencing Tr., R. 11-4, PageID # 6702–06.  The trial court did *not* consider those records in rendering its competency decision; rather, the court solely relied on Dr. Gazley's opinion.  *Id.*

And the district court's conclusions regarding the law are equally misplaced. The district court relied heavily on *Medina*'s language that due process requires

63

"only the most basic procedural safeguards" for competency hearings.  Order, R. 31, PageID # 13161.  But *Medina* makes clear that these "basic procedural safeguards" cannot ring hollow—they must provide defendant "a fair opportunity to present [the] defense" and "to participate meaningfully in [the] judicial proceedings." *Medina*, 505 U.S. at 445.  And when the Court in *Medina* stated that defendant must be afforded "a reasonable opportunity that he is not competent to stand trial," *id.* at 451, it did so against the backdrop of the facts presented therein. To determine the defendant's competency in *Medina*, the trial court conducted a six-day hearing with testimony from lay witnesses, three psychiatrists, and two psychologists. *Id.* at 440–41; *see also, e.g.*, *Stanley v. Lazaroff*, 82 F. App'x 407, 411 (6th Cir. 2003) (sufficient competence determination where the defense presented three experts and the State presented two experts, with the experts interviewing the defendant on several occasions and for numerous hours).  In stark contrast, Ms. Roberts' hearing lasted less than two hours (beginning at 1:25 p.m. and ending the same day at 2:50 p.m.) and the trial court permitted the testimony of only a single witness who had reviewed a limited number of documents and interviewed Ms. Roberts for only a few hours.  Resentencing Tr., R. 11-4, PageID # 6675–28.

Moreover, *Medina* requires courts to consider whether the at-issue safeguards have been provided to other defendants as a matter of "historical practice."  505 U.S. at 446.  Ohio courts have long provided far more procedural safeguards to defendants

64

in competency proceedings than were afforded Ms. Roberts. *See, e.g.*, *State v. Mink*, 805 N.E.2d 1064, 1071–74 (Ohio 2004) (after the defense obtained an independent expert, the court appointed two additional clinical psychologists to evaluate defendant's competency, and the experts interviewed defendant over numerous days and performed psychological testing); *State v. Ferguson*, 844 N.E.2d 806, 813–17 (Ohio 2006) (competency hearing was preceded by an expert's nine-hour clinical interview over five days and the administration of various psychological testing).

In the end, Ms. Roberts' procedural incompetence claim has merit and is at least adequate to deserve encouragement to proceed further. This Court should therefore grant a COA on that claim.

## III. This Court should grant a COA on Ms. Roberts' claim regarding pretrial publicity (Fifth Claim for Relief).

The right to an impartial jury "goes to the very integrity of the legal system." *Gray v. Mississippi*, 481 U.S. 648, 668 (1987). Particularly where the defendant's life is at stake, the Sixth Amendment requires a change of venue where prejudicial news coverage prior to the trial makes it impossible for jurors to be impartial. In those cases, courts presume prejudice and a transfer of venue is required.

This is such a case. The media coverage of Ms. Roberts' case in her small town of Howland Township, Ohio—which emphasized the salacious nature of the murder and the fact that her paramour had been tried just months before with extensive media coverage—denied Ms. Roberts the constitutional protections of a

65

fair and impartial jury. While the seated jurors stated in voir dire that they could set aside all information learned outside of the courtroom, "the frailties of human nature" render these statements of impartiality of little weight in a community saturated with prejudicial publicity. *Irvin v. Dowd*, 366 U.S. 717, 727–28 (1961).

While the district court agreed that this pretrial-publicity claim was preserved for federal review, it ultimately dismissed the claim on the merits. Order, R. 31, PageID # 13142. Jurists of reason could debate that merits assessment. This Court should therefore find that the issue is adequate to deserve encouragement to proceed further and grant a COA on this claim.

### A.   The pretrial publicity in Ms. Roberts case was presumptively prejudicial.

"[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722. "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). While the constitution does not limit jury membership to persons completely ignorant of the facts and issues, *Mu'Min*, *v. Virginia*, 500 U.S. 415, 428 (1991), a defendant's right to an impartial jury may be secured if a juror attests that he or she can set aside any outside information and render a verdict based on the evidence presented in court. *Irvin*, 366 U.S. at 722–23.

"Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).  Thus, "[w]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."  *Id.* at 363.  Transferring venue in such circumstances is a "basic requirement of due process."  *Skilling v. United States*, 561 U.S. 358, 378 (2010).

These considerations are particularly compelling where the defendant's "life is at stake."  *Irvin*, 366 U.S. at 727–28.  Indeed, in capital cases, the jurors must be impartial not only as to the defendant's guilt, but also with respect to imposing the death penalty.  *Morgan v. Illinois*, 504 U.S. 719, 726–29 (1992).

In certain cases, the pretrial publicity is so pervasive and injurious that prejudice is presumed.  *See, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); *Sheppard*, 384 U.S. 333.  In such cases, appellate courts order a new trial without conducting a harmless-error analysis.  *Gray*, 481 U.S. at 668; *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986).

Drawing from prior precedent, the Court in *Skilling* distilled several factors relevant to whether a court should presume prejudice from pretrial publicity.

561 U.S. at 382–83. Specifically, the *Skilling* Court considered: (1) the size and characteristics of the community, (2) whether the pretrial publicity was blatantly prejudicial, (3) the passage of time between the publicity and the trial, and (4) whether the jury's conduct was inconsistent with a presumption of prejudice. *Id.*

Applying these factors to Ms. Roberts' case, the trial court should have presumed prejudice and ordered a change of venue. Prior to voir dire, trial counsel moved for a change of venue. Mot. Change of Venue, R. 12-2, PageID # 7620–49. The motion attached 67 exhibits regarding news stories that had been run in the area. *Id.* at PageID # 7650–7769. The trial court deferred deciding the issue until after voir dire. Trial Tr., R. 11-1, PageID # 783. After voir dire, the court denied the motion, stating "the Court feels very comfortable that this case can be fairly tried in this county." Trial Tr., R. 11-3, PageID # 4857.

That was error because the relevant considerations compel a finding of presumed prejudice. Ms. Roberts' trial took place in a relatively small community of far fewer people than the "4.5 million individuals eligible for jury duty" in *Skilling*. 561 U.S. at 382. At the time, Trumbull County had a population of only 225,000. Trial Tr., R. 11-2, PageID # 3254. There was an extraordinary amount of media coverage in this very small media market, and the potential jurors (whether they admitted it or not) were influenced by the media.

Further, the media that saturated Trumbull County was blatantly prejudicial. Mr. Jackson's trial had ended in a death penalty verdict only four months prior to the start of Ms. Roberts' trial. Mot. Change of Venue, R. 12-2, PageID # 7627, 7714, 7731. Thus, all the evidence admitted at Mr. Jackson's trial filled the headlines before Ms. Roberts' trial even began. Mot. Change of Venue, R. 12-2, PageID # 7650–7769. This included coverage on Mr. Jackson's "videotaped confession," which was not admitted at Ms. Roberts' trial. *See, e.g.*, *id.* at 7665–66, 7689, 7691; *see Skilling*, 561 U.S. at 382 (explaining that a confession is "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"); *Rideau*, 373 U.S. at 725–26 (presuming prejudice where pretrial publicity included filmed police statement). Not only that, the articles included statements from Mr. Jackson's own attorneys saying that they understood why the jury convicted Mr. Jackson of murder. Mot. Change of Venue, R. 12-2, PageID # 7715. The news coverage also conveyed gruesome details about the murder, including testimony that "[o]ne of the wounds would have dropped [Mr. Fingerhut] like a sack of potatoes." *Id.* at PageID # 7691.

And these news stories were not simple recitations of the facts. *Compare Patton v. Yount*, 467 U.S. 1025, 1032 (1984) (no prejudice where publicity consisted of "purely factual articles generally discussing not the crime or prior prosecution, but the prolonged process of jury selection"); *Beck v. Washington*, 369 U.S. 541,

556 (1962) (no prejudice where "[e]ven the occasional front-page items were straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness"). Rather, they contained "the kind of vivid, unforgettable information [the Court has] recognized as particularly likely to produce prejudice." *Skilling*, 561 U.S. at 385. The news coverage consistently used charged and sensationalized language, such as referring to Ms. Roberts as an "unmarried woman" and the letters between Mr. Jackson and Ms. Roberts as "sexually explicit." *See, e.g.*, Mot. Change of Venue, R. 12-2, PageID # 7657, 7664, 7666, 7673. They described the relationship between Mr. Fingerhut, Mr. Jackson, and Ms. Roberts as a "love triangle." *Id.* at PageID # 7673, 7676. One news story cited testimony that Ms. Roberts used a "soft, sexy 'Southern Belle-like voice'" to "convince[] an imprisoned Jackson to carry out the plot to kill Fingerhut, an avid sports memorabilia collector." *Id.* at PageID # 7719.

The news articles also included extremely prejudicial statements by the Trumbull County Prosecutor, Dennis Watkins. Mr. Watkins reportedly stated that Mr. Jackson and Ms. Roberts made their "plan of death and destruction" in a hotel room "with a Jacuzzi, big bed and mirrors." *Id.* at PageID # 7684. He also told reporters that the Jackson case "is the most documented and proven case of premeditated murder I've ever seen in my career." *Id.* at PageID # 7723; *see also id.* at PageID # 7712, 7727. The press reports also cited a family member's call for

the death penalty, *id.* at PageID # 7732, 7768, and an acquaintance of Mr. Jackson who blamed Ms. Roberts for the crime, *id.* at PageID # 7732.  *See Irvin*, 366 U.S. at 725 (jury not impartial where "curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations").

Importantly, the press also reported on an affidavit for an arrest warrant with references to sexually explicit love letters and tapes between Ms. Roberts and Mr. Jackson.  Mot. Change of Venue, R. 12-2, PageID # 7626–27.  The trial court unsealed this affidavit shortly before Ms. Roberts' trial, despite acknowledging that "it does nothing except cause possible prejudice in picking a jury."  Trial Tr., R. 11-1, PageID # 301, *see also id.* at PageID # 308–10.

Moreover, the passage of time between the publicity in Ms. Roberts' case and her trial was far less than that in *Skilling*, consisting of roughly four months between Mr. Jackson's sentencing (and the accompanying news flurry) and the start of her trial, as opposed to the four years that passed in *Skilling*.  561 U.S. at 383.  Indeed, the news stories remained ongoing throughout Ms. Roberts' trial.  *See, e.g.*, Trial Tr. R. 11-1, PageID # 1371, 1883; Trial Tr. R. 11-2, PageID # 2912.

71

Finally, the jury's conduct of finding Ms. Roberts guilty and sentencing her to death was entirely consistent with a presumption of prejudice. *See Skilling*, 561 U.S. at 383–84.

And this conclusion is also "clearly reflected" in what occurred during voir dire. *Irvin*, 366 U.S. at 727. At that time, the trial court was well aware of the publicity that was buzzing around Ms. Roberts' case. The court acknowledged that "[m]ost people have heard something about the case. It has been kicking around for some time." Trial Tr. R. 11-1, PageID # 704. One potential juror stated that she had been following the case closely in the media and had already formed an opinion on guilt, to which the court responded, "You understand that most of the people out there, even though many of them did not hold their hands up, they probably all heard or seen something. The case has been around awhile." *Id.* at PageID # 724. And the court was correct. When asked, most of the potential jurors had read (sometimes extensively) about the case and were familiar with Mr. Jackson's trial.[7] Many

---

[7] *See, e.g.*, *id.* at PageID # 638, 705, 790, 808, 945–46, 1028, 1340–41, 1429, 1554–59, 2004, 2059, 2090, 2224, 2265, 2431–32; Trial Tr., R. 11-2, PageID # 2531–32, 2655, 2705, 2829–30, 2870, 3151–55, 3163–65, 3188–89, 3215, 3255, 3416, 3519, 3564–65, 3569, 3700, 3774–75, 3846–47, 3901–02; 3959–61, 4125, 4245–46, 4357–58, 4527, 4572, 4625–26; Trial Tr., R. 11-3, PageID # 4962.

admitted that they had already formed opinions about Ms. Roberts' guilt, particularly given that Mr. Jackson had already been convicted and sentenced to death.[8]

### B.    The district court's assessment of this claim is wrong and, at a minimum, debatable.

In adjudicating this claim, the Ohio Supreme Court acknowledged that there was "a great deal of publicity about the murder and Jackson's trial in Trumbull County." Order, R. 31, PageID # 13142, 13146. Yet the court denied the claim, reasoning that "extensive voir dire helps to eliminate any negative effect arising from the pretrial publicity" and "the trial court engaged in such an effort." Order, R. 31, PageID # 13143. According to the court, this was "evidenced by the facts that voir dire took a month to complete and encompasses more than 20 volumes and approximately 4,700 pages of transcript." *Id.* The court also noted that four of the prospective jurors (whose voir dire Ms. Roberts had cited) "never sat on the final panel, so prejudice to Roberts is not shown." *Id.*

This was contrary to, and an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Where prejudice is presumed, courts do not "paus[e] to examine a particularized transcript of the voir dire examination of the members of the jury." *Rideau*, 373 U.S. at 727; *see also Riley v. Taylor*, 277 F.3d 261, 299 (3d Cir. 2001) (Alito, J.) ("Where media or other community reaction to a

---

[8] *See, e.g.*, Trial Tr. R. 11-1, PageID # 705–06, 1527, 1954, 2006–09; Trial Tr., R. 11-2, PageID # 3167–68, 3525–26; 3909–12; 3941–42, 4247.

crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors.").  It is only when "pretrial publicity *cannot* be presumed prejudicial" that the court "must then determine whether it rises to the level of actual prejudice" through "a searching voir dire of prospective jurors." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007) (emphasis added).  Indeed, the whole point of presuming prejudice is to recognize that where the community was so pervasively exposed to prejudicial publicity, "the jurors' claims that they can be impartial *should not be believed*."  *Mu'Min*, 500 U.S. at 429 (quoting *Patton*, 467 U.S. at 1031) (emphasis added).  In those circumstances, voir dire is simply not "adequate to effectuate the constitutional guarantee" of a fair trial.  *Groppi v. Wisconsin*, 400 U.S. 505, 510 (1971).  Thus, by focusing on actual prejudice without addressing the claim of presumed prejudice, the state court strayed from federal law.

The state court also unreasonably determined the facts. 28 U.S.C. § 2254(d)(2).  The court focused on the length of the voir dire without acknowledging that it took so long due to the amount of jurors who were struck for cause.  Order, R. 31, PageID # 13143.  And Ms. Roberts' citation to the voir dire responses was not simply to show *actual* prejudice, but to confirm that the circumstances were such that prejudice should have been *presumed*.

For its part, the district court held that the Ohio Supreme Court "reasonably concluded that the publicity surrounding Roberts' trial was not the type of 'extreme case' in which juror prejudice should be presumed" because Ms. Roberts did not present evidence that a "carnival atmosphere pervaded the courthouse." *Id.* at PageID # 13146.   But, again, the state court directed its analysis to *actual* prejudice—it came to no "conclu[sion]" on *presumed* prejudice. *Id.*  In any event, a "carnival atmosphere" in the courthouse is not a necessary precondition for a presumption of prejudice.  Rather, the inquiry focuses on the nature, pervasiveness, and recency of the pretrial publicity.  *Skilling*, 561 U.S. at 379–85; *Rideau*, 373 U.S. at 722–26.  As explained above, those factors compel a presumption of prejudice here.  The media was fixated on a dramatized story of an older white lady involved in an explicit sexual relationship with a younger Black man, who together hatched a "plan of death and destruction" in a seedy motel room to murder her ex-husband for insurance money.  Because Mr. Jackson had been tried, convicted, and sentenced to death for the murder only a few months prior, this sensationalized (and pervasive) news coverage was fresh in the minds of Ms. Roberts' jurors.  These are the circumstances that necessitate a presumption of prejudice and a change of venue.

In the end, Ms. Roberts' pretrial publicity claim has merit and is at least adequate to deserve encouragement to proceed further.  This Court should therefore grant a COA on that claim.

## CONCLUSION

Reasonable jurists could debate whether the district court's assessment of Ms. Roberts' claims is correct. Ms. Roberts therefore requests that this Court grant a COA on her Second, Third, Fourth, Fifth, and Seventh Claims for Relief.

Respectfully submitted,

STEPHEN C. NEWMAN (0051928)
FEDERAL PUBLIC DEFENDER

*/s/ Calland M. Ferraro*
Calland M. Ferraro (0093439)
Assistant Federal Public Defender

*/s/ Jillian S. Davis*
Jillian S. Davis (0067272)
Research and Writing Attorney
Office of the Federal Public Defender,
Northern District of Ohio
Capital Habeas Unit
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856 (o); (216) 522-1951 (f)
Calland_Ferraro@fd.org
Jillian_Davis@fd.org

*Counsel for Petitioner-Appellant*
*Donna Roberts*

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2024, a copy of the foregoing Memorandum of Law in Support of the Application for an Expanded Certificate of Appealability was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

*/s/ Calland M. Ferraro*
Calland M. Ferraro